IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs October 10, 2017

## STATE OF TENNESSEE v. HOWARD MELTON

**Appeal from the Criminal Court for Knox County**
**No. 106607    Bob R. McGee, Judge**

_____

### No. E2017-00613-CCA-R3-CD

_____

The defendant, Howard Melton, appeals his Knox County Criminal Court jury conviction of sexual exploitation of a minor, claiming that the trial court erred by improperly admitting certain evidence and that the evidence was insufficient to support his conviction.  Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Liddell Kirk (on appeal) and Keith Lee Lieberman (at trial), Knoxville, Tennessee, for the appellant, Howard Melton.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel Russell and Joanie Stewart, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In October 2015, the Knox County Grand Jury charged the defendant with two counts of especially aggravated sexual exploitation of a minor and one count of sexual exploitation of a minor.  Prior to trial, the State dismissed both counts of especially aggravated sexual exploitation, and the trial court conducted a jury trial in April 2016 on the single count of sexual exploitation of a minor.

The State's proof at trial showed that the defendant was the stepgrandfather of victim M.S.[1] and the grandfather of victim S.M.  Both victims would often spend the

_____

[1]    As is the policy of this court, we will refer to the victims by their initials.

night at the defendant's home. On one such occasion when the victims were 10 or 11 years old, the defendant played a "Girls Gone Wild" video for them. S.M. described what she recalled of the video as follows:

> There w[ere] parts where the guys would go up to the girls and ask them if they want to be in the *Girls Gone Wild* movie, and they said all they had to do was basically flash them, like, pull your shirt up and flash them and there would be stars covering their nipples.
>
> And then there was one where they were on stage and they were in, like, really, really tiny bikinis and they were wrestling . . . .

After watching the video with the victims, the defendant informed them that "that's how girls [their] age acted" and suggested that they "should go record [their] own" video. The defendant provided the victims with a video camera and instructed them on how to operate it, including how to hit the "record" button, but told them that the camera contained no video cassette or means to record any footage. The defendant's wife, Patty Melton, was asleep at the time.

While the defendant remained in the living room, the victims entered the bedroom that they shared at the defendant's house and removed all of their clothing. The victims took turns operating the video camera while the other person "danced in front of the camera," jumped on the bed, and "grabb[ed her own] boobs." S.M. testified that she and M.S. used Barbie dolls to "rol[e] play," and the victims even used a lamp as a "stripper" pole. M.S. testified that she knew what they were doing was "weird" but that at the time she could not grasp her future embarrassment. M.S. denied that she would have made the video if the defendant had not requested it. M.S. believed the defendant when he told her that the video camera contained no means of recording because she "just trusted him."

Because the victims were "being loud" while filming the video, they awoke Mrs. Melton, who entered their bedroom and told them to be quiet and go to bed. M.S. estimated that she and S.M. had been filming themselves for approximately 15 minutes. The victims immediately went to bed. Later, S.M. saw the defendant enter the bedroom and retrieve the video camera, but he said nothing to the victims.

In April 2014, 17-year-old S.M. spent the night at the defendant's house. The following morning as she was preparing to leave, the defendant told S.M. to "look what [he] found." When S.M. turned toward the television, she saw that the defendant

was playing a digital video disc ("DVD") which showed S.M. "dancing on the bed naked, grabbing [her] breasts" and showed M.S. "jumping up and down" unclothed. The defendant told S.M. that "he had found it in the tapes that he was going through," although S.M. was "pretty sure" that the recording he was currently playing was on a DVD rather than a video home system ("VHS") tape. After Mrs. Melton remarked how "cute" the victims looked on the recording, S.M. turned away and left the residence.

When M.S. was about 16 years old, she learned for the first time that a video recording of her actions with S.M. existed. This knowledge caused M.S. to feel "[h]umiliated and embarrassed and ashamed." On cross-examination, M.S. admitted that she had never seen the video and had no personal knowledge that the video existed.

After Knoxville Police Department ("KPD") Investigator Jonathan Harris spoke with both M.S. and S.M., he executed a search warrant of the defendant's residence on June 23, 2015. As a result of that search, Investigator Harris recovered the video camera at issue as well as nearly 3,000 VHS tapes and "several hundred" DVDs. In the course of his investigation, Investigator Harris located three DVDs that were labeled as "Girls Gone Wild." Two of the DVDs were "bootlegged" copies of a "Girls Gone Wild Ultimate Spring Break" video, wherein men with video cameras would frequent bars, motels, and beaches and ask women "to show their breasts and get naked for the camera, dance with each other, make out." The third DVD was unplayable but a note on the DVD case was labeled as "[M.S.] and [S.M.] making home movie." The disc itself was labeled as "[M.S.] and [S.M.]'s, a *Girls Gone Wild* movie."

KPD employee Brittany Hodge, an electronic evidence collection specialist, examined the unplayable DVD and was able to determine that it previously "had some kind of data on it" and that it was "not a blank disk that would be fresh out of the packaging from the store." Ms. Hodge explained the methodology behind this process as follows:

> [J]ust looking at [the DVD] in a visual manner, it has had – it's darker in color. Any DVD that you would buy, when you put it in your computer to, you know, burn data onto it, like pictures or videos, it's not as dark. And then when I put it in my computer that I use to conduct the forensic exams, it did not prompt me – you know, it didn't say, you inserted a blank disk. What would you like to do with it? It didn't – it didn't go through that. And when I added it into my software, it showed that it was zeros in the data.

Ms. Hodge testified that, based on her training and experience, the DVD had been erased rather than having been corrupted.

With this evidence, the State rested. Following a *Momon* colloquy and the trial court's denial of the defendant's motion for judgment of acquittal, the defendant elected to testify and chose to present proof.

Pamela Hancock, the self-professed best friend of Mrs. Melton, testified that she was once present at the defendant's residence when S.M. delivered a video to the defendant, and she stated that she heard S.M. tell the defendant, "Daddy said to give you this *Girls Gone Wild* tape." The incident stood out to Ms. Hancock because, at the time, S.M. was "a little bit younger than" Ms. Hancock's son, and Ms. Hancock "didn't think that a child that young would even know what that meant." On cross-examination, Ms. Hancock admitted that she did not actually see the video and was unsure whether it was a VHS tape or a DVD.

The defendant testified that, on one occasion, S.M. and M.S. entered the room where he was seated. S.M. reached over his shoulder and said, "[H]ere's a *Girls Gone Wild* video Daddy said to give you." The defendant testified that he made no comment and merely placed the video on a shelf where he kept items to keep them away from his grandchildren. Later that afternoon, the victims approached the defendant and asked if they could borrow his camera to video their dollhouse and dolls. The defendant reluctantly agreed after M.S. assured him that she knew how to operate the camera. The defendant then retrieved a new video tape, placed it inside the video camera, and gave the camera to the victims.

Less than an hour later, the victims returned to the defendant and explained that they were unhappy with their recording and that they wished to erase it. The defendant demonstrated to the victims the method for erasing the tape, and the victims returned to their bedroom. Approximately two hours later, the victims brought the camera back to the defendant. He removed the tape, which he believed to be blank, and he placed it on the shelf with other video tapes.

Several months later, the defendant retrieved that same video tape and discovered that it was not blank. Instead, the defendant saw the victims "up on the bed and hollering like it was in a stadium, '*Girls Gone Wild*,' like that." The defendant watched approximately two to three minutes of footage and stated that the victims were "fully clothed." Believing that the video would be "something cute to show them later on," the defendant labeled the video tape as "[M.S.] and [S.M.] home video" and put the tape away.

Nine years later, the defendant discovered the tape again. On Mother's Day 2015, the defendant showed the video to M.S., her mother, and her stepfather, who is the defendant's son. M.S. told the defendant that she didn't "really want to watch it" but that she "want[ed] to take it home." Because the defendant's son did not own a device that would play a VHS tape, he asked the defendant to convert the video to a DVD. The defendant did so, labeling the DVD as "*Girls Gone Wild*, [M.S.] and [S.M.]"

The defendant denied ever showing the victims a "Girls Gone Wild" video or instructing them as to what the victims should film. The defendant also insisted that S.M. had never seen the video that the victims made and that M.S. was mistaken in her belief that she had never seen it.

When asked on cross-examination if he was familiar with "Girls Gone Wild" videos at the time that S.M. allegedly brought a copy to him, the defendant explained that he had received such videos before from S.M. but that he "didn't get into that" because he was "60 years old." The defendant denied ever watching that particular "Girls Gone Wild" video. The defendant testified that he was "not into pornography" and that he was "way older than – you know, to want to see something like that." When shown a copy of a second, shorter version of a "Girls Gone Wild" video found by Investigator Harris in the defendant's house, the defendant admitted that it was labeled with his handwriting. The defendant thought that he "might have attempted" to make a copy of that video but that he was unsure why he would have done so.

Upon further questioning, the defendant stated that he was "not interested" in pornography and denied having an interest in pornography when the victims made their own "Girls Gone Wild" video at his residence. The defendant conceded that he did own pornography at that time and that he kept it hidden underneath his bed. The defendant insisted that he had never asked his son to send the "Girls Gone Wild" video to his house with S.M.

On redirect examination, the defendant agreed that he "had some interest in pornography when [he] was younger" but that he had lost interest as he had aged, and the defendant stated that "[w]hat little [he had] seen was on HBO and stuff."

On recross examination, the defendant explained that he copied the short "Girls Gone Wild" video for his brother but insisted that he personally had never watched it. The defendant admitted that he possessed some printed poronogaphic material but stated that some of it belonged to his sons and grandchildren.

A.M.,[2] the defendant's son and M.S.'s stepfather, offered rebuttal testimony for the State. He recalled being present at the defendant's residence on Mother's Day 2015, but he denied that the defendant showed a video portraying M.S. and S.M. on that day or on any other day. A.M. testified that the defendant had never asked him to watch a video and that he would have remembered if he had seen a video involving M.S. and S.M.

Based on this evidence, the jury convicted the defendant as charged of sexual exploitation of a minor. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of 3 years' incarceration to be served at 30 percent.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by permitting the State to cross-examine him about his interest in pornography and that the evidence was insufficient to support his convictions. We will address each issue in turn.

*I. Cross-Examination of Defendant*

The defendant first contends that the trial court erred by permitting the State to repeatedly cross-examine him regarding his purported interest in pornography because the probative value of such testimony was substantially outweighed by the danger of unfair prejudice. The State responds that the defendant opened the door to this line of questioning by downplaying his interest in pornography and that, in any event, the testimony was not so inflammatory as to have been unfairly prejudicial.

During cross-examination, the defendant, when questioned regarding his familiarity with the contents of "Girls Gone Wild" videos, responded that he "didn't get into that" and insisted that he had not watched the video allegedly handed to him by S.M. The State later revisited the issue of the defendant's interest in "Girls Gone Wild" videos, and the following exchange occurred:

> Q:     And you said that even though . . . [S.M.'s father] sent the *Girls Gone Wild* video with S.M., that you're not into that kind of thing?

---

[2]     To protect the anonymity of the victims, we will refer to this witness by his initials.

A: Well, no. I mean, I'm not – I mean, guys are going to be guys, but I'm way older than – you know, to want to see something like that.

Q: Okay. Now, when you said you wouldn't want to see something like that, what are you talking about?

A: Any, you know, *Girls Gone Wild* tape. It's all the same thing.

Q: Okay. What – what is all the same thing? You're talking about – when you say "Girls Gone Wild," are you talking about pornography?

A: Some of it's not.

Q: Okay. Then are you saying that you wouldn't be – when you say you're not into that kind of thing, are you saying you're not into pornography, that you're not into –

A: No, I'm not into pornography.

In a hearing outside the presence of the jury, the State argued that the defendant had opened the door to questions about pornographic materials found in his home. Defense counsel responded that the probative value of such evidence was substantially outweighed by the danger of unfair prejudice. The trial court ruled that the defendant had, in fact, "distanced himself from any interest in pornographic material," which therefore opened the door to allow the State "to challenge him as to whether or not he has ever had an interest in pornography and ever collected" pornography. The trial court refused to allow the State to address "specific instances of the pornography" or "the amount of the pornography."

When the jury returned to the courtroom, the State resumed its cross-examination of the defendant. The defendant reiterated his lack of interest in pornography at the time the victims made the video at issue. He admitted, however, that he had owned pornography during that time period and that he kept it under his bed. On redirect examination, he agreed that he had "aged out of" his interest in pornography and that "[w]hat little [he had] seen was on HBO and stuff."

The State again requested a bench conference, arguing that the defendant had opened the door to the introduction of specific pornographic magazines dated around

the time of the offense that were found in his house and explaining that the discovery of those magazines belied the defendant's contention that his knowledge of pornography was limited to HBO. Expressing concern that "the danger of unfair prejudice bleeding over into this case outweigh[ed] the probative value," the trial court permitted the State to conduct a proffer examination of the defendant outside of the jury's presence.

During the proffer examination, the defendant testified that he had never gone "to the porn store" and purchased any pornographic materials. The defendant claimed that all of the printed pornographic material found in his home belonged to his two sons and had been collected prior to the birth of any of his grandchildren. He acknowledged that he had inherited video tapes from his brother but denied receiving any printed materials from his brother. The State then argued to the trial court that Investigator Harris had found six pornographic magazines in the defendant's house that had been published in the 2000s and that the defendant's youngest two grandchildren had been born in the 1990s. The State asked permission to introduce into evidence those six magazines which contradicted the defendant's prior testimony. The trial court ruled as follows:

> [T]he State has established that [the defendant] has had an interest in pornography. And to try to go into further detail about it is, I think, leading us into an area of unfair prejudice. . . . You can establish that the stuff he got wasn't just from HBO and ask him what sources he did use and that's where the [c]ourt's going to have to stop.
>
> . . . .
>
> And [the defendant] did open [the door] part of the way, and I've allowed the State to go into the fact that he has been a pornographer – a pornography collector. And I'll let you go further and establish that it was more than just HBO. And at that point, the [c]ourt's going to have to say stop.

With the jury back in the courtroom, the State resumed its recross-examination of the defendant, in which he acknowledged that he had previously testified that the only pornographic material he had seen had been limited to HBO and Showtime. He then admitted that he had some printed pornographic material in his house but claimed that some of it belonged to his sons and grandchildren and explained that he and his wife just "stored" it at their home. The defendant also admitted that he had made a copy of a "Girls Gone Wild" video for his brother but that he had never watched it.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005).

Although not raised by either party, we believe the true avenue for admission of the defendant's interest in and possession of pornographic material was impeachment through fact contradiction. "Through fact contradiction, a cross-examining party inquires about facts that conflict with the witness's testimony to show indirectly that the witness is untruthful." *State v. Jeremy Sims and Sherry Brookshire*, No. W2013-01253-CCA-R3-CD, slip op. at 20 (Tenn. Crim. App., Jackson, Sept. 25, 2015). Fact contradiction is a long-standing impeachment device that is indigenous to cross-examination and enjoys implied currency in our rules of evidence; it emanates simply from the power to attack a witness's credibility as expressed in Tennessee Rule of Evidence 607. *Id.*; *see* Neil P. Cohen et al., Tennessee Law of Evidence § 6.07[4][a] (6th ed. 2011). Here, the defendant testified in no uncertain terms that he was not "into pornography" and attempted to limit his knowledge of or interest in pornography to that which he had seen on HBO and the like. The State was then properly allowed to question

the defendant about his possession of printed pornographic material, which clearly contradicted his prior testimony. With respect to the relevancy of such testimony, the trial court conducted more than one thorough and thoughtful bench conference, with an eye toward the potential prejudicial impact of such testimony, and strictly limited the State's ability to question the defendant about any specific pornographic material. Thus, we conclude that the probative value of the testimony regarding the defendant's interest in pornography was not substantially outweighed by the danger of unfair prejudice.

## II. Sufficiency

The defendant also contends that the evidence is insufficient to support his conviction of sexual exploitation of a minor. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[i]t is unlawful for any person to knowingly possess material that includes a minor engaged in . . . [s]exual activity." T.C.A. § 39-17-1003(a)(1). "Sexual activity," as is relevant to this case, includes "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus or pubic or rectal area of any person." *Id.* § 39-13-1002(8)(G).

Appellate review of the determination of lasciviousness is a mixed question of fact and law. *See State v. Whited*, 506 S.W.3d 416, 427 (Tenn. 2016).

The appellate court must review the finding by the trier of

fact that the depiction is a lascivious exhibition, including underlying factual issues such as the extent to which the minor appears nude or whether the minor appears to be portrayed in a sexually suggestive manner. *See* [*United States v.*] *Rayl*, 270 F.3d [709,] 714 [(8th Cir. 2001)]. In addition, looking at the evidence in a light most favorable to the verdict, the appellate court must determine whether the depiction is legally sufficient to constitute a "lascivious exhibition" within the meaning of the statute. The latter determination is a question of law subject to plenary review. *Id.*

*Id.*, 506 S.W.3d at 427.

Although "lascivious exhibition" does not have a statutory definition, our supreme court addressed it extensively in *Whited*. Noting that a determination of lasciviousness is "'an intensely fact-bound question,'" the high court stated that "it is generally accepted that mere nudity, without more, is insufficient to establish a lascivious exhibition of private body areas." *Id.* at 431 (quoting *United States v. Schuster*, 706 F.3d 800, 806 (7th Cir. 2013)). In *Whited*, the defendant surreptitiously recorded his victims doing ordinary, daily activities: entering and exiting the shower, using a towel to dry off, grooming, and changing clothes. *Whited*, 506 S.W.3d at 442. Each of the videos at issue "depict[ed] nudity of a minor or minors to varying degrees," but the camera never focused exclusively on the victims' private areas, and "nothing in the videos indicate[d] that the victims were posed or coached; they [were] not in any unnatural or overtly sexual poses and appear[ed] unaware of the camera." *Id.* at 442, 446. Although finding the "question [to be] close," the court held that the videos did not rise to the level of lascivious exhibition primarily because the minor victims were "engag[ed] in everyday activities that [were] appropriate for the settings and [were] not sexual or lascivious within the ordinary meaning of those terms." *Id.* at 447.

Similarly, in *State v. Robert Grisham*, No. E2015-02446-CCA-R3-CD (Tenn. Crim. App., Knoxville, May 5, 2017), *perm. app. denied* (Tenn. Sept. 20, 2017), the defendant concealed a camera in a bathroom to record the minor victim taking a shower and performing other ordinary grooming tasks. *Id.*, slip op. at 34. This court likewise held that the video recording was insufficient to constitute lascivious exhibition. *Id.*

In the instant case, the proof at trial established that, when the victims were 10 or 11 years of age, the defendant, their grandfather, showed them a "Girls Gone Wild" video and told the victims that "that's how girls their age acted." The defendant then told

- 11 -

the victims that they should record their own video, provided them with a video camera, showed them how to operate it and how to hit the "record" button, and assured them that the camera did not include a video tape. The victims then entered their bedroom, where they removed all of their clothing and took turns dancing in front of the camera, jumping on the bed, and "grabbing" their breasts, even using a lamp as a stripper pole. Later that night, the defendant retrieved the video camera. Several years later, the defendant showed the video recording to 17-year-old S.M., who described seeing herself "dancing on the bed naked, grabbing [her] breasts" and watching M.S. "jumping up and down" while naked. Investigator Harris located two "Girls Gone Wild" DVDs in the defendant's residence, as well as a DVD case labeled as "[M.S.] and [S.M.] making home movie" and the included DVD labeled as "[M.S.] and [S.M.]'s, a *Girls Gone Wild* movie." Ms. Hodge, a KPD electronic evidence collection specialist, examined the latter DVD, found it to be unplayable, and determined that the content on the DVD had been erased. The defendant admitted that the victims had made a video at his house in which they were "up on the bed and hollering like it was in a stadium, '*Girls Gone Wild*,' like that" and that he had converted the video to a DVD which he labeled as "*Girls Gone Wild*, [M.S.] and [S.M.]." Although the defendant claimed that the victims were fully clothed in the video, such matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not reweigh such evidence. *See Dorantes*, 331 S.W.3d at 379.

When viewing this evidence through the lens of *Whited*, we find that the portrayal of the victims in the video, as described by the victims, was certainly more than mere nudity, and, unlike the victims in *Whited* and *Grisham*, the victims in the instant case were not simply engaging in ordinary, daily activities. M.S. and S.M. were actually directed by the defendant to make their own "Girls Gone Wild" video after being shown a pornographic video and being provided with the means to make a video of their own by the defendant. The victims' self-described acts of removing all of their clothing, dancing in front of the camera, jumping on the bed, grabbing their breasts, and using a lamp as a stripper pole could certainly be construed as "unnatural" and "overtly sexual," and the victims were unquestionably aware of the camera. *Whited*, 506 S.W.3d at 446. Thus, these facts cogently establish that the video portrayed a lascivious exhibition and, therefore, that the defendant knowingly possessed material that included minors engaged in sexual activity.

Viewing this evidence in the light most favorable to the prosecution, we find that the evidence adduced at trial sufficiently established the defendant's conviction of sexual exploitation of a minor.

*Conclusion*

Based upon the foregoing analysis, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE